**Michael K. DANIELS, Appellant,**

v.

**STATE of Alaska, Appellee.**

**No. A-1344.**

Court of Appeals of Alaska.

Jan. 20, 1989.

---

Rich Curtner, Asst. Public Defender, Palmer, and Dana Fabe, Public Defender, Anchorage, for appellant.

John A. Scukanec, Asst. Atty. Gen., Office of Special Prosecutions and Appeals, Anchorage, and Grace Berg Schaible, Atty. Gen., Juneau, for appellee.

Before BRYNER, C.J., and COATS and SINGLETON, JJ.

## OPINION

BRYNER, Chief Judge.

Michael K. Daniels was tried and convicted of one count of sexual abuse of a minor in the first degree, AS 11.41.434(a)(2), for the abuse of his foster-daughter, S.B. Superior Court Judge John Bosshard, III, sentenced Daniels to a presumptive term of eight years. Daniels appeals, contending that the trial court erred in denying Daniels' request for a psychiatric examination of S.B., in granting a protective order against inquiry into S.B.'s prior sexual conduct, in admitting hearsay, and in refusing Daniels' motion for a judgment of acquittal. Daniels also contends that he received ineffective assistance of counsel at trial.

Finally, Daniels argues that his sentence is excessive. We reverse.

S.B. was placed as a foster-child in the home of Michael Daniels and his wife, Debra, during the winter of 1984. S.B. was then thirteen years old. In addition to S.B., the Daniels had two younger children living with them. On Tuesday, March 27, 1984, S.B. told her school nurse that Daniels had sexually assaulted her on the previous Saturday, March 24. According to S.B., Daniels entered her bedroom at night while she was asleep and inserted his penis into her vagina; S.B. awoke and told Daniels to "get the hell off me and get out of my room." Daniels then left.

Based on S.B.'s report, an Alaska State Trooper interviewed Daniels. Daniels denied having sexual contact with S.B. Daniels acknowledged entering S.B.'s bedroom to cover her up. He said that he might have touched S.B., "but not in any incriminating manner." Daniels was subsequently arrested and charged with sexually abusing S.B.

At trial, Daniels defended on the theory that S.B. had fabricated her claim of sexual abuse. Daniels attempted to establish that, on the day following the alleged assault, Debra Daniels told S.B. that she would not be allowed to remain in foster care at the Daniels' home. Daniels claimed that S.B. immediately responded by telling Debra Daniels that Daniels had sexually assaulted S.B. According to Daniels, S.B. knew that the state would probably place her in a group home or at the McLaughlin Youth Center if she did not succeed in the Daniels' home. Daniels' theory was that S.B.'s anger over being told that she would not be able to remain in his home prompted her to retaliate by falsely claiming that Daniels had sexually abused her.

In support of this theory, Daniels sought to show, through his own testimony, through the testimony of his wife, and through cross-examination of S.B., that the Daniels had reached their decision not to keep S.B. in their foster care after learning of S.B.'s involvement in a sexual assault on a young child. Daniels offered to show that, on the Friday preceding S.B.'s claim

that she had been sexually assaulted, S.B.'s social worker had informed Daniels and his wife that S.B. had admitted sexually molesting a five-year-old boy. Because the Daniels had two young children in their home, this information prompted them to decide that S.B. would not be able to remain with them. According to the defense theory, Debra Daniels told S.B. that she would have to leave the Daniels' home because of what she had done. In response to being accused of sexually molesting a five-year-old boy, S.B. became angry and retaliated by telling Debra Daniels, "Well, Michael [Daniels] did the same thing to me."

The state objected to the admission of any evidence establishing S.B.'s involvement in a sexual assault on another child, arguing that such evidence would be unduly prejudicial. The state requested the trial court to issue a protective order precluding cross-examination of S.B. or testimony by the Daniels on the issue. The trial court agreed with the state, finding that any probative value that the disputed evidence might have was outweighed by its potential for prejudice. The court barred Daniels from cross-examining S.B. on the issue and from presenting testimony concerning the Daniels' reason for deciding that S.B. would not be allowed to remain in their custody.

On appeal, Daniels argues that the trial court's decision to exclude the disputed evidence deprived him of his constitutional right to be confronted with the witnesses against him. U.S. Const. amend. VI; Alaska Const. art. 1, § 11. In our view, the issue is controlled by *Davis v. Alaska,* 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974).

In *Davis,* the trial court precluded the defense from inquiring into the juvenile record of Green, the prosecution's primary witness. Green was on juvenile probation after being adjudicated a delinquent for burglary. Davis contended that Green's juvenile record was relevant to establish that Green's identification of Davis was motivated by Green's fear that his probation might be revoked. Relying on a stat-

ute barring public disclosure of juvenile records, the trial court granted the state's motion for a protective order to prevent any reference to Green's juvenile record during cross-examination.

In concluding that the trial court's ruling had deprived Davis of his constitutional right to confrontation, the United States Supreme Court emphasized that the primary purpose of the right of confrontation is to secure the opportunity for meaningful cross-examination:

> A[n] ... attack on the witness' credibility is effected by means of cross-examination directed toward revealing possible biases, prejudices, or ulterior motives of the witness.... [E]xposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination.

*Davis*, 415 U.S. at 316–17, 94 S.Ct. at 1110. The Court went on to find the constitutional right to be of paramount significance and held that it was improper to balance this right against the witness' statutory right to privacy. *Id.* at 319, 94 S.Ct. at 1111–12. In reaching this conclusion, the Court stated that "the jurors were entitled to have the benefit of the defense theory before them so that they could make an informed judgment as to the weight to place on Green's testimony." *Id.* at 317, 94 S.Ct. at 1111.

In the present case, as in *Davis*, "the jurors were entitled to have the benefit of the defense theory before them," since the theory was essential to an informed evaluation of S.B.'s credibility. At trial, Daniels offered to show that S.B.'s claim of sexual abuse against Daniels had come on the heels of a similar accusation by Debra Daniels against S.B.[1] Evidence disclosing the specific nature of Debra Daniels' communication with S.B. would have established a potentially strong reason for S.B. to have wanted to retaliate against the Daniels. Moreover, by suggesting that S.B.'s accusation against Daniels was in effect a *quid pro quo*, the excluded line of inquiry would have tended to explain why S.B.'s anger found expression in the form of an accusation of sexual abuse.

Compounding the restrictive effect of the court's order precluding cross-examination of S.B. was the court's order precluding both Daniels and his wife from making any specific reference in their own testimony to the information concerning S.B.'s assaultive conduct toward another child. The proposed defense testimony concerning Debra Daniels' communication with. S.B. was critical to lend plausibility to Daniels' claim that he and his wife had decided that they could no longer keep custody of S.B. Stripped of any meaningful detail and communicated to the jury only in the most abstract and conclusory terms, the claim that the Daniels had reached the decision not to keep S.B. as a foster child just before S.B. accused Daniels of sexual abuse could only have seemed an anemic contrivance.

■ When coupled with the restriction on the Daniels' own testimony, the restriction on S.B.'s cross-examination virtually

---

1. The offer of proof made by Daniels' trial counsel was reasonably specific, both in terms of the evidence that Daniels sought to elicit and the relevance of that evidence. Daniels' trial counsel stated, in relevant part:

> The reason [S.B.'s] act plays such an important part here, it was the discussion of [S.B.'s] act that precipitated this accusation. The Daniels had just been to talk with the counselor of [S.B.] the day before, and they had just learned of [S.B.'s] act. And since the Daniels have two smaller children, they were advised against the keeping of [S.B.], that small children were not safe around her.... Because of that, the Daniels confronted her with it. Mrs. Daniels confronted her with that; [S.B.], we can't keep you anymore, we just learned

you performed an act of sodomy on a five-year old; we can't trust you any longer around our kids. Then she said, well, Michael did the same thing to me, and precip— and proceeds with this accusation. So we believe that that is particularly pertinent in view of the fact that it was that which led to this whole thing, her motive, her revenge for being told that she's going to be kicked out of this foster home. Her next home would have been McLaughlin or Jesse Lee. She didn't want to go to those homes.... [W]e feel that we shouldn't have our hands tied in our defense because this is a very serious charge that could get an innocent man up to thirty years.

foreclosed Daniels from providing the jury with a meaningful opportunity to assess the likelihood that S.B. might have been motivated to fabricate her claim of sexual assault against Daniels. Under the circumstances, Daniels' constitutional right to confrontation clearly overrides any legitimate concern for S.B.'s right to privacy. Under *Davis v. Alaska,* Daniels' right to confrontation was entitled to precedence.[2] The denial of Daniels' right to confront and cross-examine S.B. requires reversal of his conviction.[3]

■■■ Because it would be impermissible to retry Daniels if insufficient evidence of guilt was presented during his first trial, we must next consider Daniels' claim that the trial court erred in denying Daniels' motion for a judgment of acquittal. Daniels' claim of error hinges almost entirely on his contention that S.B. was not a credible witness. However, the credibility of witnesses is exclusively a question for the jury and cannot properly be considered in determining the sufficiency of the evidence presented below. *See Anthony v. State,* 521 P.2d 486, 492 (Alaska 1974). When

viewed in the light most favorable to the state, the evidence presented below was sufficient to allow fair-minded jurors to differ on the issue of Daniels' guilt. Accordingly, the trial court properly denied Daniels' motion for a judgment of acquittal and submitted his case to the jury. *See Dorman v. State,* 622 P.2d 448, 453 (Alaska 1981); *Maloney v. State,* 667 P.2d 1258, 1267 (Alaska App.1983).

■■■ We believe it appropriate to decide one additional issue that Daniels raises on appeal, since it appears likely that the issue might recur in the event of a retrial.[4] Prior to trial, Daniels moved for a psychiatric evaluation of S.B. The superior court denied Daniels' motion, ruling that he had failed to make an adequate showing justifying the need for an evaluation. On appeal, Daniels challenges the court's ruling.

In *Pickens v. State,* 675 P.2d 665, 668 (Alaska App.1984), this court adopted a two-part test for determining when the defendant in a sexual assault case is entitled to an order requiring the complaining witness to undergo a psychiatric examination:

**2.** Nothing in Alaska's Rape Shield Statute (AS 12.45.045) or Alaska Rule of Evidence 404(a)(2) requires a contrary conclusion. The primary purpose of the Rape Shield Statute is to prevent the use of evidence of past sexual conduct as proof of the victim's current willingness to consent. *See, e.g., Wood v. State,* 736 P.2d 363, 365 (Alaska App.1987); *Kvasnikoff v. State,* 674 P.2d 302, 306 & n. 5 (Alaska App.1983). The Rape Shield Statute is not intended to exclude evidence of prior sexual conduct when such evidence is directly relevant to establish bias, prejudice, or motive to fabricate. *See, e.g., State v. Jalo,* 27 Or.App. 845, 557 P.2d 1359 (1976) (application of Rape Shield Statute violated defendant's right to confrontation when excluded evidence was relevant to establish the complaining witness' motive for making a false charge); *State v. Delawder,* 28 Md.App. 212, 344 A.2d 446 (1975) (evidence of the complaining witness' prior sexual conduct held admissible when it specifically established a motive to make a false claim of rape).

**3.** In conjunction with his claim that the trial court erred in precluding inquiry into S.B.'s sexual assault on a five-year-old child, Daniels has also argued that the court erred in precluding inquiry concerning two prior instances in which S.B. has reported being sexually assaulted by other men. However, while it is conceivable that evidence of prior false accusations against

others by S.B. might have been relevant and admissible, Daniels has failed to show that S.B.'s prior claims of sexual abuse were false. To the contrary, it appears that, in one of the two prior instances, S.B.'s claim resulted in a conviction. In the other instance—a charge of sexual abuse against S.B.'s stepfather—prosecution was apparently declined, but S.B. was removed from her stepfather's home. Given Daniels' failure to establish the falsity of S.B.'s prior accusations, the trial court did not err in precluding inquiry on the issue. *See, e.g., Covington v. State,* 703 P.2d 436, 442 (Alaska App.1985), *modified on rehearing,* 711 P.2d 1183 (Alaska App.1985); *Moor v. State,* 709 P.2d 498, 508–09 (Alaska App.1985).

**4.** Our decision to reverse Daniels' conviction renders his claims of ineffective assistance of counsel and his sentence appeal moot. Daniels has also argued that the trial court erred in admitting various hearsay statements. Because many of the challenged statements were admitted without objection, and because this court's intervening decision in *Nitz v. State,* 720 P.2d 55 (Alaska App.1986), resolves many of the issues addressed by the parties in connection with this point, there is little reason to believe that a decision on this point would be of any benefit to the parties or the superior court in the event of a retrial. For this reason, we decline to reach it.

We ... believe that the trial judge should be authorized to order the [prosecuting witness] to submit to a psychiatric examination if the circumstances indicate a necessity for an examination. Such necessity would generally arise only if little or no corroboration supported the charge and if the defense raised the issue of the effect of the complaining witness' mental or emotional condition upon her veracity.

*See also Anderson v. State*, 749 P.2d 369, 371 (Alaska App.1988).

To fulfill the first prong of the test, Daniels was required to demonstrate that there was little or no evidence to corroborate S.B.'s testimony. Although there was some corroborating evidence presented against Daniels, that evidence was relatively slight.

The state's evidence at trial established that a pubic hair that might have originated from Daniels was found on a quilt used on S.B.'s bed. Beard hairs and other unidentified hairs were also found on the quilt. However, the evidence indicated that S.B. frequently carried the quilt around the house and that she had used it outside during a recent garage sale. There was no evidence positively linking any of the hairs to Daniels.

Additional corroborating evidence consisted of testimony by Daniels' brother-in-law, Michael Alexander, indicating that, after being accused by S.B., Daniels told Alexander that he had "touched" S.B., that he felt bad about touching her, and that he felt he had been wrong. Alexander further testified, however, that Daniels had told him, "there was no sex involved" in the touching. On cross-examination Alexander qualified much of his testimony. He agreed with defense counsel that Daniels might have said "[S.B.] says I touched her," rather than "I touched her." Alexander also acknowledged that Daniels might have "felt bad" about the trouble S.B. had caused, rather than about some particular act on his part.

The only additional corroborative evidence was the testimony of Trooper Rollie Port, who had been assigned to obtain a court-ordered pubic hair sample from Daniels shortly after Daniels was arrested. Trooper Port testified that, when he initially contacted Daniels at the jail, Daniels refused to cooperate in submitting a sample. Port went to get help. When he returned to the cell, Daniels was standing over the urinal and appeared to be brushing his pubic hair. Daniels, however, explained that the only reason he refused to submit to the sample initially was that he had not been provided with a lawyer. Daniels also testified that he was simply urinating when Port returned to the cell.

Although the totality of the evidence apart from S.B.'s testimony certainly has some tendency to corroborate her claim of sexual abuse, the corroborating evidence is hardly compelling in nature. The case against Daniels basically hinges on the credibility of S.B.'s testimony. While the corroborating evidence provides some indication that S.B.'s claim may be truthful, it falls far short of being conclusive or even clearly convincing. Under the circumstances, we believe that the corroboration is sufficiently slight to warrant the conclusion that the first prong of the *Pickens* standard has been established.

To satisfy the second prong of the *Pickens* test, however, Daniels was required to establish some specific ground for concluding that S.B. suffered from psychological or emotional problems that might affect her veracity or have a direct bearing on some other material issue. *Pickens*, 675 P.2d at 668–69. As this court said in *Moor v. State*, 709 P.2d 498, 508 (Alaska App. 1985): "[A] strong showing of materiality is required before we will reverse a trial court's decision not to grant a psychiatric evaluation of a prosecution witness."

Daniels attempts to comply with the second prong of the *Pickens* standard by arguing, as he did below, that S.B. has made two prior claims of sexual abuse. Reliance on S.B.'s prior accusations, however, provides no indication of potential untruthfulness in the absence of credible evidence indicating that the prior claims were false.

At trial and on appeal, Daniels has made conclusory allegations that the prior claims

were untruthful. The record is devoid of any reliable evidence to substantiate the claims. To the contrary, it appears from the record that S.B.'s first claim resulted in a conviction. The prosecution apparently declined to pursue criminal charges on S.B.'s second claim, which was made against S.B.'s stepfather. Standing alone, however, a prosecutorial decision not to initiate a criminal case is hardly evidence supporting the conclusion that S.B.'s claim was untruthful. Since the record shows that S.B. was removed from the custody of her mother and stepfather following her accusation, it appears that the charge was not simply rejected as baseless. Daniels argues that there is no substantial evidence to prove that the accusation was not a fabrication. This argument misconstrues the applicable standard, which places the burden of establishing falsity on Daniels.

Daniels also advances the argument that S.B.'s apparent involvement in molesting a five-year-old boy somehow indicates that a psychiatric evaluation would provide useful information. This claim is unpersuasive. The possible relationship between S.B.'s sexual behavior toward another child and her credibility as a witness is hardly self-evident. Daniels has failed to submit any evidence establishing a possible nexus between S.B.'s purported misconduct and her veracity or any other material issue in the case.

Finally, Daniels attempts to establish compliance with the second prong of the *Pickens* standard by relying on an affidavit of Phillip Kaufman, a therapist who has been providing S.B. with psychological counseling. The affidavit upon which Daniels relies indicates that a psychiatric examination would be "beneficial in evaluating [S.B.'s] capacity and credibility." Daniels' reliance on this affidavit is misguided. The record establishes that this affidavit was obtained from Kaufman by Daniels' trial counsel without disclosing the purpose for which it was sought. A second affidavit submitted by Kaufman at the request of the prosecution establishes that Kaufman believed a psychiatric evaluation would be helpful only in that it would strongly support the conclusion that S.B. was truthful in her charges against Daniels:

> I in no way whatsoever intended to be read that there was a question regarding the credibility of the victim in reference to the charges against Mr. Daniels. I felt it would be beneficial in the sense that an independent examination would confirm my belief that S.B. is credible and capable of accurate recall and testimony.

Daniels did not challenge the explanation in the second affidavit or seek to call Kaufman as a witness to reconcile any possible discrepancy between the two affidavits. When Kaufman's initial affidavit is read in context with his second affidavit, it is apparent that, in Kaufman's view, there is no basis for concluding that a psychiatric evaluation would yield information adversely reflecting on S.B.'s veracity.

Having reviewed the record of proceedings below, we conclude that, although Daniels has satisfied the first prong of the *Pickens* standard, he has failed to satisfy the second prong. Accordingly, the trial court did not abuse its discretion in denying Daniels' motion for a psychiatric evaluation of S.B.

Daniels' conviction is REVERSED, and this case is REMANDED for a new trial.